# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

United States of America
v.

HICHAM A. ELHORR, M.D.

Case No.

Case: 2:12-mj-30577
Judge: Unassigned,
Filed: 09-19-2012 At 01:47 PM
IN RE: SEALED MATTER (CMP)(MRM)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __01/01/2008 through 09/18/2012__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. Section 1347 | HEALTH CARE FRAUD |
| 18 U.S.C. Section 1349 | HEALTH CARE FRAUD CONSPIRACY |

This criminal complaint is based on these facts:

SEE AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

JAMES GRZESZCZAK, SPECIAL AGENT, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/19/12

*Judge's signature*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James Grzeszczak, being duly sworn, hereby state as follows:

1. I am a Special Agent (SA) with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations (HHS-OIG) and have been employed as such since October 2001. I am currently assigned to the Detroit Field Office. My duties and responsibilities include conducting criminal investigations of individuals, organizations and businesses that have violated federal laws, including those laws found at 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1349 (Health Care Fraud Conspiracy). I have gained expertise in how to conduct such investigations through seminars, classes, prior education and related work.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other experienced law enforcement agents and witnesses; as well as documents obtained from a variety of sources, including witnesses, Medicare claims data and bank records analysis. I have not included each and every fact known to me concerning this investigation.

## I.    OVERVIEW

3. I have been involved in an investigation of Dr. Hicham Elhorr (Elhorr) a.k.a "Hicham El-Horr" and "Hicham Elorr," related to billing the Medicare Program, for services that were not provided, and/or which were medically unnecessary, in violation of 18 USC § 1347, as well as conspiring to commit health care fraud, in violation of 18 USC § 1349.

4. Elhorr has led and directed a scheme in the Detroit Metro area through the ownership of his home visiting physician company. He employs unlicensed physicians; physicians who are required to be directly supervised as a condition of their license; physician's assistants; and other unlicensed personnel who purportedly provide physician home visits. These individuals provide minimal, if any, services.

5. Elhorr then bills the physician home visits to Medicare and other medical insurance carriers as if a fully licensed physician rendered physician home visit services to the beneficiaries. In addition to claims submitted for the purported physician home visits, the beneficiaries are subjected to referrals for medically unnecessary services, such as home health care and diagnostic testing, and provided medically unnecessary prescriptions for narcotic drugs.

## II.   BACKGROUND

### A.    ORIGIN OF THE INVESTIGATION

6. The investigation was initiated following receipt of a referral from TrustSolutions, LLC (TS). TS was the Program Safeguard Contractor for Medicare Part B in the State of Michigan, tasked with investigating waste, fraud and abuse to the Medicare Program. The referral was

the result of proactive data analysis, which revealed that Hicham Elhorr, through House Calls Physicians, PLLC (HCP) billed for services that were not rendered, billed for services not meeting Medicare coverage and payment guidelines, had up-coded services, and altered documentation. Data analysis revealed that on certain days Elhorr had billed more than twenty-four hours of services per day for services provided in the homes of Medicare beneficiaries, billed a high volume of high level evaluation and management codes in the homes of Medicare beneficiaries, and reimbursement noticeably increased from 2008 to 2009.

7. A peer review indicated that out of 265 providers in the State of Michigan, Elhorr ranked number sixteen for providers that billed procedure code, 99350. Procedure code 99350 represents the highest level/most complex physician home visit for an established patient. A review of the referral data revealed that fifty-four percent of Elhorr's patients were billed procedure code 99350.

### B. MEDICARE PROGRAM

8. The Medicare program is a health care benefit program, as defined in Title 18 USC § 24(b), in that it is a public plan, affecting commerce, which helps pay for health care services provided to the aged and disabled throughout the United States under the provisions of the Social Security Act. The Medicare program is administered through the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration. CMS is a federal agency within the United States Department of Health and Human Services. Medicare is paid for through two trust fund accounts held by the U.S. Treasury which can only be used for Medicare.

9. Wisconsin Physicians Service (WPS) is the CMS contractor that administers the Medicare Program related to outpatient claims for beneficiaries in the State of Michigan, which includes services related to physician home visits. These services are covered under Medicare Part B.

10. To enroll in the Medicare program, providers complete and submit a provider enrollment application. The application includes multiple sections to include identifying information, practice location information, and certification statements, such as the following:

    a. By signing the certification statement, the provider agrees to adhere to all of the requirements listed in the section, including that they agree to abide by the Medicare laws, regulations and program instructions that apply to them, and that the Medicare laws, regulations, and program instructions are available through the fee-for service contractor;

    b. The provider further acknowledges that they understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction, complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law) and on the provider's compliance with all applicable conditions of participation in Medicare;

    c. The provider also agrees that they will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

11. Medicare participating providers are issued a Provider Identification Number (PIN). Medical providers submit claims to Medicare using their PIN. Each claim for reimbursement includes, at a minimum, the beneficiary's name, the beneficiary's health insurance claim number (HICN), the date(s) of service, the diagnosis/nature of the illness, and the procedure/service performed (annotated by procedure code).

### C. ELHORR AND HOUSE CALLS PHYSICIANS

12. Elhorr is the owner of multiple medical businesses, to include: House Calls Physicians, PLLC, Hicham Elhorr MD; and House Calls Doctors, PC. Elhorr was also issued a provider number for Fatima Health Care, PC. Elhorr is associated with numerous employees of the above named businesses as well as various home health agencies.

13. Elhorr is a Medicare provider and has submitted claims to the Medicare program through billing companies.

14. House Calls Physicians (HCP) is a Michigan corporation in the Eastern District of Michigan.

15. HCP serves as the business office for Elhorr's home visiting practice, which purportedly provides physician services to patients in their homes. According to Articles of Incorporation filed with the State of Michigan, House Calls Physicians, PLLC, was incorporated on January 27, 2006. Hicham Elhorr was listed as the President on the annual filing documents beginning in 2008, through 2012. The 2012 annual filing document lists Hicham Elhorr with the street address of 10 Gleneagles, Dearborn, Michigan 48120.

16. According to the Michigan Department of Community Health website, Elhorr was licensed in Michigan as a Medical Doctor on or about May 27, 2005. Elhorr was assigned Permanent ID number 4301080756. Elhorr was also licensed to prescribe controlled substances under Permanent ID number 5315022641, which was also issued on or about May 27, 2005.

17. The National Plan & Provider Enumeration System (NPPES) revealed that Elhorr was assigned National Provider Identification (NPI) number 1255314779, on or about November 29, 2005. The NPI is the standard unique identifier for a health care provider. CMS developed the NPPES to assign the unique identifiers.

18. A review of Medicare documents, financial documents and/or interviews have revealed the following additional current and/or former HCP providers/employees:

Ali Elhorr, Lama Elhorr, Fitzgerald Hudson, Jose Mercado-Francis, Kelly White, Omar Turk, Georges Jabaly, Sunanda Nioguy, Timothy Blackerby, Marcella Clark, Issam Asad, Saleh Ghaith, Kenneth Mitchell, Robert Kuffa, Shalbhadra Bafina, Anwar El-Khatib, Linda Woodworth, Colleen Law, Tolga Kurt, Milagros Ebreo, Michael Dymond, Stuart Knott, Bruce Kaplan and Sakina Hakim.

19. Medicare issued provider numbers under the HCP group for the following medical personnel under which claims were billed:

| PROVIDER NAME | NPI | PIN UNDER HCP | EFFECTIVE DATE |
|---|---|---|---|
| Turk, Omar (MD) | 1407824634 | P40280001 | 12/1/2006 |
| Jabaly, Georges (MD) | 1407827074 | P40280002 | 12/1/2006 |
| Nioguy, Sunanda (MD) | 1427197417 | P40280003 | 9/26/2007 |
| Blackerby, Timothy (DPM) | 1568554137 | P40280004 | 10/1/2007 |
| Elhorr, Hicham (MD) | 1255314779 | P40280005 | 1/18/2008 |
| Clark, Marcella (MD) | 1902028913 | P40280006 | 1/29/2008 |
| Asad, Issam (MD) | 1396941332 | P40280007 | 2/1/2008 |
| Mercado-Francis, Jose (MD)(License Terminated) | 1114973955 | P40280008 | 8/1/2008 |
| Ghaith, Saleh (MD) | 1033326970 | P40280009 | 8/1/2008 |
| Mitchell, Kenneth (DPM) | 1144390873 | P40280010 | 9/15/2008 |
| Kuffa, Robert (DO) | 1013134295 | P40280011 | 7/1/2008 |
| Elhorr, Ali (MD) | 1730379983 | P40280013 | 7/1/2009 |
| El-Khatib, Anwar (PA) | 1275863102 | P40280014 | 12/20/2009 |
| Law, Colleen (PA) | 1396071361 | P40280016 | 12/19/2009 |
| Ebreo, Milagros (MD) | 1376552117 | P40280018 | 11/6/2010 |
| Dymond, Michael (MD) | 1063613727 | P40280019 | 11/30/2010 |
| Knott, Stuart (MD) | 1982655353 | P40280020 | 6/1/2011 |
| Hudson, Fitzgerald (MD) | 1639367725 | P40280021 | 5/19/2011 |
| Kaplan, Bruce (MD) | 1548271208 | P40280022 | 8/1/2011 |

20. Electronic Funds Transfer documents dated on or around September 4, 2008, revealed that Medicare payments for HCP and Hicham Elhorr, MD would be sent to a Comerica Bank checking account.

21. Electronic Data Interchange (EDI) enrollment forms for HCP were signed 'Hicham Elhorr' and dated February 5, 2010. EDI enrollment forms were also submitted for Hicham Elhorr MD, PC DBA Dearborn Family Medicine Center. The EDI forms for that business were signed 'Hicham El-Horr, MD' and dated January 15, 2007. By signing the EDI enrollment forms the provider understands their provider number is used to bill Medicare, through contracted carriers, directly for services rendered to beneficiaries who are eligible to receive medical services under the Medicare Part B program. Furthermore, the provider agrees to only submit claims for services rendered, and that he will maintain past and current records (to verify that all services were provided) for a period of six years and three months following payment by Medicare. On the EDI, Elhorr claimed he would submit claims through Payerpath (A Msys Company) and/or Blue Cross Blue Shield of Michigan (BCBSM).

22. The Medicare Provider Enrollment documentation also revealed that Elhorr was assigned provider number P40280005, under the HCP group. The PIN was effective January 18, 2008. The documentation was signed 'Hicham A. Elhorr' and dated January 16, 2008.

## D. PHYSICIAN HOME VISITS

23. The procedure codes used by providers for physician home visits are found in the Current Procedures Technology (CPT) code book published by the American Medical Association. For the period of January 1, 2008 through October 20, 2011, over 69% of the claims HCP billed to Medicare consisted of three primary physician home visit codes:

    a. 99345 – A home visit for the management and evaluation of a new patient where the following components are present: a comprehensive examination, medical decision making of high complexity; the patient is usually unstable or has developed a new problem requiring immediate physician attention, and physicians spend 75 minutes, face to face, with patient and/or family.

    b. 99349 – A home visit for the management and evaluation of an established patient where 2 of the following 3 components are present: a detailed interval history, a detailed examination, medical decision making of moderate complexity, typically problems are of moderate to high severity and physicians spend 40 minutes, face to face, with patient and/or family.

    c. 99350 – A home visit for the management and evaluation of an established patient where 2 of the following 3 components are present: a comprehensive interval history, a comprehensive examination, medical decision making of moderate to high complexity; typically problems are of moderate to high severity, the patient

may be unstable or may have developed a new problem requiring immediate physician attention, and physicians spend 60 minutes, face to face, with patient and/or family.

|       |                                 |                |
| ----- | ------------------------------- | -------------- |
| 99345 | Home Visit, New Patient         | $698,940.00    |
| 99349 | Home Visit, Established Patient | $2,634,865.00  |
| 99350 | Home Visit, Established Patient | $3,547,120.00  |

The three above-referenced codes resulted in approximately 82% of the amount Medicare paid HCP.

24. WPS issued several Local Coverage Decisions (LCD) related to Home and Domiciliary Services, which mandate that:

   a. The service/visit must be medically reasonable and necessary and not for the convenience of the Part B provider or beneficiary;

   b. Services provided in the home must not unnecessarily duplicate services provided to the beneficiary by other practitioners;

   c. The physician must be the provider of record and be responsible for managing the entire disease process addressed in the visit;

   d. A Part B provider cannot solicit the visit.

   e. All medical services provided to the beneficiary must be either ordered or personally performed by the provider;

   f. There is no "incident to" a physician's service in place of service home; therefore all drugs or services must be personally administered by the Medicare Part B provider;

   g. Services provided to beneficiaries who are also seeing other Medicare Part B providers in their offices for the same diagnosis will be assumed not medically necessary;

   h. If the results of diagnostic testing will not change the medical management or result in surgery, there is no medical necessity for the procedures;

   i. Performance of multiple or common tests without clear evidence of medical need of the beneficiary or changes in the treatment regimen based on the lab tests would not be considered reasonable and necessary as mandated by 42 CFR 410.32; and

      j. The medical record must document the medical necessity of all services performed during a home visit.

25. WPS also issued a Companion Billing and Coding Article, which supplements the LCD covering Home and Domiciliary Visits. The supplement addresses reasons claims may be denied, which include:

      a. The service is solicited;

      b. The beneficiary is treated by other providers in their offices for the same diagnosis;

      c. The record does not clearly demonstrate that the beneficiary, his/her delegate, or the primary physician sought the initial services; and

      d. The service is not medically necessary and/or abnormal results will not change the beneficiary's plan of care.

### III.    FACTS SUPPORTING PROBABLE CAUSE

26. Evidence supporting probable cause has been gathered through numerous investigative measures including, but not limited to: (1) Medicare beneficiary complaints; (2) interviews of former and current employees of Elhorr and HCP; (3) interviews of beneficiaries billed by Elhorr and HCP and/or referred for home health care by Elhorr and HCP; (4) interviews of other individuals with knowledge of Elhorr HCP; (5) analysis of Medicare data; and (6) surveillance of Elhorr and HCP.

### A.    COMPLAINTS TO MEDICARE

27. On or about September 8, 2009, Medicare beneficiary JS filed a complaint with Medicare. A review of the complaint revealed allegations that HCP did not provide the services that were billed to Medicare. On or about November 9, 2009, Medicare notified HCP that a medical review revealed the medical records did not support the services that were billed. Three of the services were for CPT code 99349, Home Visit, Established Patient.

28. On or about January 22, 2010, Medicare beneficiary BM filed a complaint with Medicare. A review of the complaint revealed allegations that HCP, under Dr. Ali Elhorr, billed Medicare for CPT code 99350, Home Visit, Established Patient, and other services that were not provided. The date of service was December 5, 2009, BM stated that he lived in Florida and had not been in the State of Michigan since April 15, 2008.

29. On or about March 16, 2011 and April 18, 2011, three former HCP employees filed a complaint with Medicare. The former employees consisted of a physician's assistant and two medical doctors. A review of the complaint revealed the following allegations:

    a. HCP billed for services using a doctor's provider number who was not employed at HCP during the time.

    b. Medicare previously contacted HCP and provided education about proper billing procedures.

    c. HCP billed for services the physician did not provide.

    d. One physician was initially employed at HCP in 2008 then rehired in 2010, as a medical supervisor. As a medical supervisor the complainant only supervised physician's assistants and co-signed patient charts.

    e. As a medical supervisor, the complainant never conducted physician home visits and never authorized HCP or anyone to submit claims to Medicare using his name or provider number. HCP used the physician's name and identifying information to bill for services purportedly provided to patients the doctor had not seen since 2008.

    f. Medco Pharmacy contacted the doctor and advised him that HCP was using his DEA number to prescribe narcotics. The doctor provided a written statement that he did not authorize or consent to HCP prescribing medications under his name or license.

    g. HCP employed Jose Mercado-Francis (Francis), whose license as a medical doctor was revoked in 2009. Francis continued to conduct physician home visits and write prescriptions for HCP.

### B.  INTERVIEWS OF CURRENT AND/OR FORMER EMPLOYEES

    1) <u>Jose Mercado-Francis Interview</u>

30. On April 13, 2012, Special Agents conducted an interview with Jose Mercado-Francis. Francis was previously employed by Hicham Elhorr at HCP. Francis stated that while working at HCP he conducted approximately 10-12 physician home visits per day, although he did not have a valid medical license. Francis stated that he saw patients as a physician all the time he was employed at HCP.

31. Because Francis did not have a medical license, he and Elhorr had an arrangement. The arrangement was that Francis saw the patients, but Elhorr completed and signed home health certifications, even for patients Elhorr had not seen in the last year. Francis stated that about 10-20% of the time, Elhorr signed home health certifications even if he did not see the patients. Francis stated that he also witnessed Elhorr adding diagnosis on home health certification forms. Francis explained that physician home visits may only last twenty minutes, but Medicare was billed for longer/more complex visits.

32. Francis speculated that the reason patients sought treatment from HCP was that Elhorr gave the patients what they wanted. Francis stated that patients got upset if they did not get their

prescriptions and threatened to contact Medicare because they were aware that Medicare was billed for services that were not provided.

33. Regarding prescriptions, Elhorr had a rule that HCP employees could not write prescriptions for OxyContin, Opana or Methadone and that prescriptions for Vicodin and Lortab were limited to 30-60 tablets.

34. Francis stated that Elhorr approached Francis about moving to Florida to work in a clinic he (Elhorr) was starting up there.

        2) <u>Issam Assad Interviews</u>

35. On or about September 22, 2011, Special Agents interviewed Issam Assad (Assad). Assad provided the following information: Assad first began working at HCP in 2008 and left HCP around 2009. Assad returned to HCP in 2010 as a physician supervisor which required that he supervise three physician's assistants. Assad stated the management structure at HCP consisted of Hicham Elhorr, Ali Elhorr and Llama Elhorr.

36. Assad stated that he was at HCP about every week and reviewed the charts for the patients allegedly seen by the PA's. Assad stated he did not accompany the PA's during any of the physician home visits. Assad stated that the files he reviewed contained both his and the PA's signatures.

37. Assad resigned from HCP effective March 8, 2011 after learning and verifying that his DEA number had been used by HCP without his knowledge or consent. Assad stated that from the beginning of his employment as a physician supervisor, he told Elhorr not to use his provider number or DEA number to bill because he was not seeing any patients. Assad stated that he discovered that the PA's at HCP provided prescriptions for medications and physical therapy and that Elhorr and other HCP employees hid it from him. Assad stated that he suspects HCP may still use his name for home health referrals because he received a phone call from a home health agency representative. When he returned the call, Assad was told that HCP had already provided the necessary paperwork.

38. On or about October 12, 2011, a Blue Cross Blue Shield Investigator and an HHS-OIG Special Agent conducted a follow-up interview with Assad. Assad stated that he worked at HCP part-time beginning around January 2010, through approximately March 8, 2011. During 2008, Assad worked at HCP for approximately three to five months. Assad stated that Ali Elhorr also supervised three PA's at HCP. Assad was asked about Blue Cross Blue Shield claims. Assad stated that he did not know why HCP submitted claims totaling approximately $180,000 under his provider number because he did not provide any services to or for HCP patients. Assad stated that after he stopped working at HCP in March 2011, he still received letters from Medco for dates of service in April and June 2011.

        3) <u>Saleh Ghaith Interview</u>

39. On or about September 23, 2011, Special Agents interviewed Ghaith. Ghaith was a previous employee and business partner with Elhorr. Ghaith stated that after he took over some

management duties at HCP he discovered issues involving prescriptions. Ghaith stated the prescriptions were written by HCP employees who were not medical doctors. Ghaith explained that the employees printed the doctor's names on the prescriptions, and then used a HCP stamp to stamp over the printed names. One of the employees who wrote prescriptions was office manager Kelly White.

40. Ghaith estimated that approximately 50% of the patient calls to HCP were to obtain prescriptions for narcotics. One of Elhorr's previous medical assistants was Hamid. Hamid told Ghaith that Elhorr told him that if you do not write the patient's prescriptions for Vicodin, you were not going to keep the patient.

41. Ghaith stated that Elhorr also had arrangements with a known home health agency (OAHC) employee. Ghaith stated that HCP was paid $700- $900 per prescription for home health care involving a nurse and physical therapist.

42. Ghaith stated that during a period when he (Ghaith) was out of the United States, Elhorr signed home health certification documents using Ghaith's name. Ghaith stated he never gave Elhorr authority to sign his name. Ghaith stated that OAHC also opened home health care services in his name, without his authority. Ghaith stated that upon review of home health documentation which he did authorize, additional items, specifically physical therapy were added without his knowledge or consent.

### C. MEDICARE BENEFICIARY INTERVIEWS

43. Special Agents have conducted approximately 8 interviews of Medicare beneficiaries billed by Elhorr for Physician Home Visits who stated that they did not receive the services billed. The following two are examples of such interviews

   1) <u>BM Interview</u>

44. On or about February 24, 2012, Special Agents interviewed Medicare beneficiary BM. BM stated that he has resided in Florida since April 15, 2008. Since the move to Florida, BM has received Medicare Explanations of Benefits related to doctors in Michigan although he has not been provided any services by the providers and has not returned to Michigan since relocating.

45. A review of HCP Medicare claims related to BM revealed that beginning on November 18, 2009, through February 13, 2010, HCP submitted claims for 4 dates of service. The claims billed totaled $1400; $1255 of which was for Physician Home Visits codes 99345 and 99350. Medicare paid a total of $781.92; $728.81 of which was for the home visits.

   2) <u>TR Interview</u>

46. On August 21, 2012, Special Agents interviewed Medicare beneficiary TR. TR stated that she was not familiar with HCP. TR stated that she had never seen Hicham Elhorr or Ali Elhorr. TR then stated that she may have seen Ali Elhorr's name on her Medicare

Explanation of Benefits for services provided by Francis. TR stated that she is not homebound. TR stated that she gets out of her house and that she drives a car.

47. A review of HCP Medicare claims related to TR revealed that beginning on September 11, 2009, through February 18, 2011, HCP submitted claims for 22 dates of service. The claims were all billed under Hicham or Ali Elhorr, two physicians that TR claimed she had never seen. The claims billed totaled $5,279; $4,265 of which was for 19 Physician Home Visits billed under codes 99349 and 99350. Medicare paid a total of $3,118.84; $2,618.85 of which was for the home visits.

### D. TOTAL MEDICARE BILLING

48. For the period beginning January 1, 2008, through October 20, 2011, HCP billed the Medicare Part B program $9,215,057.25. Of that amount Medicare allowed $6,666,117.68 and paid $5,137,615.81. The following providers accounted for approximately 80.9% of the amount HCP billed Medicare and approximately 81.9% of the amount Medicare paid HCP.

| Provider # | Provider | Amount Billed | Amount Paid | Claims Date Range |
|---|---|---|---|---|
| P40280005 | Elhorr, Hicham | $3,610,856.75 | $1,929,510.84 | 1/19/08 – 10/20/11 |
| P40280013 | Elhorr, Ali | $2,279,804.00 | $1,326,640.95 | 9/23/05 - 7/16/11 |
| P40280007 | Asad, Issam | $1,495,283.75 | $910,345.19 | 3/12/08 - 3/4/11 |
| P40280008 | M-Francis, Jose | $22,440.00 | $10,190.14 | 7/31/08 - 10/29/08 |
| P40280021 | Hudson, Fitzgerald | $55,180.00 | $32,767.72 | 5/19/11 – 10/15/11 |
| | TOTALS: | $7,463,564.50 | $4,209,454.84 | |

Physician Home Visit codes 99345, 99349 and 99350 for the above providers accounted for $5,710,900 of the submitted claims and $3,547,753.67 of the amount that Medicare paid.

49. A review of the most recent HCP Medicare claims information revealed that HCP submitted claims to Medicare as recent as September 14, 2012. The 2012 year-to-date billings totaled $1,055,315.74.

50. HCP providers made 6,544 Medicare beneficiary referrals to approximately 296 home health companies. Medicare reimbursement related to those referrals totals approximately $30,780,475.98.

### E. MEDICALLY IMPOSSIBLE MEDICARE BILLING

51. During the period beginning January 1, 2008, through October 20, 2011, Elhorr submitted claims to Medicare which represented more than 24 hours of service in one day on approximately 75 occasions. The timed services did not include travel time and were based upon services billed using his provider identification number.

52. During the claims period, Hicham Elhorr submitted 2 claims for services that were after a Medicare beneficiary's date of death. Both claims were for physician home visits.

| Medicare Beneficiary | Procedure Code | Date of Service | Date of Death | Amount Billed |
|---|---|---|---|---|
| V. U. | 99349 | 9/1/2010 | 8/4/2010 | $135.00 |
| G. W. | 99350 | 1/2/2009 | 9/24/2008 | $250.00 |

53. Claims data also revealed 69 lines of Part B claims submitted to Medicare while patients were in Part A facilities, either hospital or skilled nursing facility. Approximately 32 lines of those claims were for CPT codes 99349 and 99350 (Physician Home Visits) with place of service home, although the Medicare beneficiary was identified as being a patient in a hospital or skilled nursing facility. The amount billed for the Part B claims totaled $6,537. Medicare paid $4,004.91 for those claims. The home visits accounted for $5,395.00 of the billed amount and $3,697.05 of the amount Medicare paid for those claims.

54. Medicare claims data revealed that Hicham Elhorr billed Medicare for physician home visits that he purportedly provided during periods when he was out of the United States on the following occasions:

| Provider Name | Date Departed US | Date Returned US | Dates of Home Visits | Amount Billed during period |
|---|---|---|---|---|
| Hicham Elhorr | 8/14/2009 | 8/30/2009 | 8/17/2009<br>8/18/2009<br>8/19/2009<br>8/21/2009 | Total Billed $23,725 (All Services)<br>$1,225.00 (7 Home Visits). |
| | 7/29/2010 | 8/17/2010 | 7/29-7/30/10<br>8/2 – 8/5/10<br>8/8 – 8/12/09 | Total Billed $24,330 (All Services)<br>$13,315.00 (94 Home Visits) |
| | 12/25/2010 | 12/31/2010 | 12/27 – 12/30/10 | Total Billed $12,885 (All Services)<br>$10,875.00 (71 Home Visits) |

### F. CONCLUSION

55. In summary, the evidence shows that Elhorr owned and operated a physician home visit service that billed Medicare for services never rendered and Elhorr personally billed Medicare for physician home visits services that were never rendered.

56. Based upon your affiant's training and experience and the facts presented herein, your Affiant respectfully submits there is probable cause to believe that Elhorr has violated 18 U.S.C. § 1347.

57. As such, your Affiant respectfully requests that an arrest warrant be issued for Hicham Elhorr.

James Grzeszczak Special Agent
U. S. Department of Health and Human Services
Office of Inspector General
Office of Investigations

Sworn to and subscribed to before me this 19th day of September ⸺, 2012.

United States Magistrate Judge
Detroit, Michigan